IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| JACK MILLER, III, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | |
| § | Civil Action No. 6:23-cv-00016-H-BU |
| ALEJANDRO TOMAS MORANTE, § | |
| § | |
| Defendant. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Jack Miller, III, appearing pro se, brings this action under 42 U.S.C. § 1983 against Defendant Alejandro Tomas Morante alleging that Morante violated his rights during a traffic stop. Miller's claims are subject to judicial screening under 28 U.S.C. § 1915(e)(2)(B) after the Court granted Miller leave to proceed *in forma pauperis*. Dkt. No. 6. Miller has not consented to the undersigned exercising the full jurisdiction of this Court; accordingly, the undersigned submits these Findings, Conclusions, and Recommendations addressing whether Miller's claims survive judicial screening. For the reasons explained below, the undersigned RECOMMENDS that the Court DISMISS Miller's claims.

**I. JURISDICTION**

The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Miller filed his claims under 42 U.S.C. § 1983. Dkt. No. 1. Venue is proper in the Northern District of Texas, San Angelo Division, because Miller's claims arise out of traffic stop that

1

occurred in San Angelo, Texas. *See id.*; 28 U.S.C. § 1391(b)(2). The undersigned has the authority to enter these Findings, Conclusions, and Recommendations after United States District Court Judge James Wesley Hendrix automatically referred Miller's case to the undersigned under Standing Order 3-251. *See also* 28 U.S.C. § 636(b)(1)(B).

## II.  FACTUAL BACKGROUND

For purposes of screening a plaintiff's complaint under 28 U.S.C. §§ 1915(e)(2)(B), a court must accept well-pleaded factual allegations as true and construe them in a way that most favors the plaintiff. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017). A court may look to the plaintiff's allegations in their complaint, responses to a questionnaire, authenticated prison or jail records, and testimony provided at a *Spears* hearing. *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999); *see also Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may consider authenticated medical and prison records).

In the early morning hours of February 27, 2021, Miller was recording police activity for "around 20 minutes" from a pickup truck parked in a private parking lot near S. Bryant Blvd. and Avenue Z in San Angelo, Texas. Dkt. Nos. 10 at 3; 1 at 7, 9. Miller was unsure of the nature of the police activity, but it was taking place across S. Bryant from where he was parked and there were "4 or 5 [SAPD] cars" involved. Dkt. No. 1 at 9. He later told Morante that he films police activity, "anytime I see red and blue lights."

While Miller was recording, Morante—an officer with the Texas Highway Patrol— "made several traffic infractions as he drove around the median several times in his patrol vehicle while waiting on me to drive away." Dkt. No. 1 at 7–8. This is in apparent reference

2

to Morante patrolling S. Bryant and stopping several other vehicles for traffic infractions during the time Miller was parked and filming the SAPD activity. Miller claims, "[o]nce I finished video recording the police interactions, I exited my vehicle and inspected all my lights before driving away." *Id*. Soon after Miller left the parking lot and pulled out onto the street, Morante activated his overhead lights and initiated a traffic stop. *Id.* at 8.

Morante approached Miller's vehicle and explained that his reason for the stop was twofold: first, Miller supposedly had a defective headlight and second, to inquire into Miller's presence in a parking lot where all the businesses were closed. *Id.* at 9. As to the former, Miller insisted that both of his headlights were working. *Id.* at 8. Miller then explained to Morante that he was in the parking lot to record the police activity occurring nearby. *Id.*

After this, Morante's line of questioning followed the typical pattern for a traffic stop. *Id.* at 9–10. Eventually, though, Morante asked Miller if he was intoxicated and would later remark that he believed Miller had pinpoint pupils. *Id.* at 8, 11. Morante asked Miller to step out of the vehicle. *Id.* at 10. Miller then refused consent for Morante to search the vehicle. *Id.* at 8.

Morante called in a request for a canine unit. *Id.* at 11. The canine unit arrived roughly ten minutes later, and the dog and his handler walked around Miller's vehicle for approximately a minute, however, the dog did not detect any contraband. *Id.*[1] Following this, Morante wrote Miller a traffic warning regarding his headlight. *Id.*

---

[1] The bodycam video reflects that the canine unit was requested at just under 7 minutes into the stop and the canine unit arrived approximately 6 minutes later.

3

### III. THE PARTIES

Miller brings his claims under 42 U.S.C. § 1983 and alleges that Morante violated his Fourth Amendment rights to be free from unreasonable seizures. Dkt. No. 1 at 3. Additionally, the undersigned construes Miller's allegations that he was stopped because he was recording police officers, *see* Dkt. No. 9 at 3, as bringing a retaliation claim under the First Amendment.

Miller seeks the following forms of relief: (1) an injunction removing Morante from patrol duty and reassigning him to another role inside the Texas Department of Public Safety; (2) nominal damages; and (3) $10,000 in punitive damages. Dkt. No. 1 at 5.

### IV. LEGAL STANDARDS

A court must dismiss a complaint subject to judicial screening under 28 U.S.C. § 1915(e)(2)(B) if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable basis in law if it contains indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

Dismissal for failure to state a claim—whether under Section 1915(e)(2)(B)(ii), Section 1915A(b)(1), or Rule 12(b)(6)—"turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per

curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief, the claims should not be dismissed merely because the plaintiff fails to articulate the proper legal theory that otherwise makes those facts actionable in court. *Johnson*, 574 U.S. at 11–12 (citing Fed. R. Civ. P. 8(a)(2)–(3), (d)(1), (e)).

Courts accept *well-pleaded* factual allegations as true. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (emphasis added). This means the factual allegations, while not required to be detailed, must amount to more than mere labels, conclusions, or a statement of the legal elements of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Chhim*, 836 F.3d at 469.

For claims to be substantively plausible, a plaintiff need not establish that the pleaded facts probably occurred as alleged, but the facts must allow the court "to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678–679). Even pro se plaintiffs must plead facts that raise the right to relief above a speculative level. *Chhim*, 836 F.3d at 469 (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)). And when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When evaluating a complaint under these standards, courts liberally construe the pleadings of pro se plaintiffs, holding their complaints to "less stringent standards than

formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "liberal construction does not require that the Court . . . create causes of action where there are none." *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013). "To demand otherwise would require the 'courts to explore exhaustively all potential claims of a pro se plaintiff'" and would "'transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.'" *Jones v. Mangrum*, No. 3:16-cv-3137, 2017 WL 712755, at *1 (M.D. Tenn. Feb. 23, 2017) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

## V.  ANALYSIS

To state a claim under § 1983, Miller must "allege facts showing that a person, acting under color of state law, deprived the plaintiff of a right, privilege or immunity secured by the United States Constitution or the laws of the United States." *Bryant v. Mil. Dep't of Miss.*, 597 F.3d 678, 686 (5th Cir. 2010).

Here, Miller claims that Morante's actions during the February 27, 2021, traffic stop violated his right to be free from unreasonable seizure guaranteed by the Fourth Amendment. Miller says that the traffic stop constitutes an unreasonable seizure because Morante lacked reasonable suspicion to initiate the stop and to prolong it. Additionally, Miller claims

6

that Morante used the traffic stop to retaliate against him for exercising his rights under the First Amendment.

### A.  The February 27, 2021, traffic stop was not an unreasonable seizure.

Miller argues that the February 27, 2021, traffic stop constituted an unreasonable seizure because Morante lacked reasonable suspicion to make the stop in the first place and that he was not justified in extending the duration of the stop to call in the canine unit.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. A person has been seized for purposes of the Fourth Amendment when a law enforcement officer conducts a traffic stop. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). Courts use the *Terry* framework to determine whether a traffic stop is an unreasonable seizure. *United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

Under the *Terry* framework, courts engage in a two-step analysis. "First, we examine whether or not the officer's decision to stop the vehicle was justified at its inception." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) (citing *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). "Second, we determine whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place." *Id*.

#### 1.  Morante's stop of Miller was justified at its inception.

According to Miller, Morante provided two reasons for his stop. The first of which was that Miller's driver-side headlight was not working. Miller insists in his Complaint

7

that his headlights were in working order, which he claims is supported by Morante's dashcam and bodycam videos. Dkt. No. 1 at 8–9; Dkt. No. 10 at 2, 4.

"A traffic stop is justified at its inception when an officer has 'an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle.'" *United States v. Walker*, 49 F.4th 903, 907 (5th Cir. 2022) (citing *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citation omitted)). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.* (internal citation and quotation marks omitted).

Reasonable suspicion, though, "is a low threshold; it is not probable cause." *Id.* at 907 (citing *United States v. Castillo*, 804 F.3d 361, 364, 367 (5th Cir. 2015)). "Certainly, then, if officers 'have probable cause to believe that a traffic violation has occurred,' then there is also reasonable suspicion to stop the vehicle." *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996). Whether an officer has reasonable suspicion depends upon "the totality of the circumstances and the collective knowledge and experience of the officer." *United States v. Estrada*, 459 F.3d 627, 631–32 (5th Cir. 2006).

The dashcam and bodycam videos are part of the authenticated record and, as just shown, their accuracy is not disputed by Miller. The dashcam video shows Morante travelling down S. Bryant Boulevard, a six-lane road with three lanes in each direction. As he approached Miller's truck, Miller was stopped at a stop sign on W. Avenue Z, a two-lane street that intersects S. Bryant Blvd. to Morante's right. Morante turned right on the W. Ave. Z where Miller was stopped and remained stopped as Morante turned. Thus, the

8

dashcam captured the front and driver's side of Miller's truck as Morante turned. Although it is impossible to determine from the video whether all the truck's front bulbs were functioning, it does appear both headlights were illuminated, at least partially.

Morante completed his right turn past the driver's side of Miller's truck, and then made a U-turn and came up behind Miller as Miller turned right onto S. Bryant Blvd. As Morante approached the rear of Miller's truck as Miller started his turn, Morante's dashcam captured Miller's right rear blinker blinking rapidly, a common indicator of a burned-out bulb somewhere in the vehicle's exterior lights. But the Court will not draw such an inference here because doing so would not be in Miller's favor.

Morante activated his overhead lights immediately after Miller turned onto S. Bryant Blvd. Morante approached Miller's passenger-side window and talked to him briefly. Morante then walked to the front of Miller's truck and his bodycam captured the front lights, which again appear to be functioning. As Morante returned to the truck window, he asked Miller to step outside. At this point, Miller acknowledged that his stepfather, who owns the truck, told him that one of the truck's lights may not work and that he might need to turn it off and on occasionally to make it work.

Once Miller stepped out of the truck, the remainder of Morante's questioning focused on whether Miller is under the influence of drugs or alcohol, and his past use of drugs and criminal history. Morante does not mention the truck's headlight again until the end of the stop when Morante issued Miller a written warning for a defective headlight.

Morante also indicated that he stopped Miller to investigate further Miller's extended parking near businesses that were closed at approximately 2:00 a.m. Miller claimed

that he was recording the activities of the San Angelo police (SAPD) across the street from the businesses' parking lot where four or five SAPD vehicles had gathered. Dkt. No. 1 at 9. He stated that he was recording the SAPD activities for approximately 20 minutes.[2] Dkt. No. 10 at 3. Morante's bodycam captured Miller saying that he films police activity anytime he sees red and blue lights.

In conducting preliminary screening of the first part of the *Terry* analysis—whether Morante's decision to stop Miller's vehicle was justified at its inception—the Court must determine whether Miller has plausibly alleged that Morante lacked an objectively reasonable suspicion that Miller was engaged in any form of illegal activity, including a traffic violation, and that Morante lacked specific, articulable facts which, taken together with rational inferences from those facts, justified the stop. As explained above, reasonable suspicion is a lower standard than probable cause and must be determined based on the experience of and totality of the circumstances faced by Morante. Stated another way, Miller must plead facts that allow the court "to infer more than the mere possibility of misconduct" by Morante. *Harold H. Huggins Realty, Inc.*, 634 F.3d at 796) (quoting *Iqbal*, 556 U.S. at 678–79).

---

[2] Miller does not claim that Morante was aware that he was recording police when Morante saw Miller's car, and there are no facts to support a different inference.

Pertaining to the initial justification for the stop, Miller's allegations focus exclusively on whether his headlight was working. Dkt. No. 1 at 7–9. The Court accepts as true that Miller's headlights were functioning at the time of the actual stop.[3]

Although Miller accurately recounted Morante asking him why he was sitting in the parking lot of closed businesses at that time of the morning, he does not directly challenge that as a justification for the stop. And accepting Miller's factual allegations as true, he was parked from 20 to 45 minutes in the parking lot of closed businesses while 4 to 5 SAPD units were responding to an unknown situation nearby. Moreover, Miller began to leave the parking lot only after Morante's patrol vehicle appeared to be approaching him.

Considering the totality of circumstances faced by Morante, the undersigned finds that on these facts the Court can do no more than infer the mere possibility that Morante lacked reasonable suspicion for initiating the stop. Accordingly, Miller has failed to plausibly allege that Morante lacked reasonable suspicion for initiating the stop. *See United States v. Trogdon*, 789 F.3d 907, 910 (8th Cir. 2015) (finding reasonable suspicion in part because "it was late at night and the businesses were closed, there was no obviously legitimate reason for Trogdon and the others to be on the property"); *United States v. Tucker*, 184 F. App'x 549, 553 (7th Cir. 2006) (finding reasonable suspicion where Defendant was loitering outside an abandoned home late at night in a high crime area); *see also United*

---

[3] But considering his concession during the stop that the vehicle may have an intermittently functioning headlight, any inference that both headlights worked normally at all times, as he sat parked while Morante patrolled back and forth, borders on unreasonable. But here, resolving the headlight dispute is unnecessary.

*States v. Miller*, 839 F. App'x 875, 878–79 (5th Cir. 2021) (per curiam); *United States v. Betts*, 806 F. App'x 426, 430 (6th Cir. 2020).

> ### 2.  *Morante's actions after initiating the stop were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place.*

The second step under the *Terry* framework is whether the officer's actions after initiating the stop were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place. *Pack*, 612 F.3d at 350. Here, Miller asserts his belief that, "[Morante] prolonged the stop because he didn't like that I was recording the police." Dkt. No. 10 at 3. And "I believe this because after I told him I was recording the police, he checked my front lights again then asked me to step out of the vehicle within 10 to 15 seconds afterward." *Id*.

"An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime. *Pack*, 612 F.3d at 350. And "[i]f the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id*.; *see also Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (noting that absent reasonable suspicion, an officer may not prolong a traffic stop beyond the time reasonably required to complete the mission of for the stop in the first place).

Here, at least one of the circumstances that caused Morante to stop Miller in the first place was Miller's extended parking near businesses that were closed at 2:00 a.m. Morante immediately explained to Miller the two reasons he stopped him. Dkt. No. 1 at 9. Morante then asked Miller for his license and insurance. *Id*. He also asked whether Miller had any firearms in the truck, to which Miller replied that he did not know because the truck did not belong to him. *Id*. Morante's bodycam captured Miller explaining that the truck belongs to his stepfather. Morante then requested his stepfather's name before asking Miller to exit the truck while Morante ran his license and the truck's license plates.

Based on all the circumstances known to Morante up to this point, and accepting Miller's alleged facts as true, the undersigned finds it implausible that Morante lacked reasonable suspicion to warrant detaining Miller further while he confirmed ownership of the truck and that Miller had permission to drive it.

After Morante ran Miller's driver's license and the truck's plates, he returned to Miller and asked him whether he is using drugs at the time. Miller replied that he is "completely sober." *Id*. at 10. Morante continued to question Miller about drug use, including whether he is currently using or has ever used methamphetamine or heroin. *Id*. Miller denied being under the influence of drugs or alcohol and eventually stopped answering Morante's questions, telling him, "I'm not answering any more questions." *Id*.

At this point, Morante told Miller that he could tell he is on drugs because his pupils were "super pinpoint." Morante then began questioning Miller more specifically about his arrest history, and Miller declined to confirm whether he has ever been arrested. *Id*. Miller continued to tell Morante that he does not answer questions, but eventually volunteered

13

that he has "never been convicted of a crime." *Id*. Morante then asked Miller whether he would consent to a search of the truck, which Miller declined to do. *Id*. Morante than told Miller that he was going to call a canine unit. *Id*.

When the canine unit arrived, Miller overheard Morante telling the canine officer about observing Miller in the parking lot and initiating the stop. *Id*. at 11. According to Miller, Morante then told the canine officer that Miller "has pinpoint pupils" and "he does have a criminal history for drugs." *Id*. After the canine unit failed to alert on Miller's truck, Morante issued him a written warning for a defective headlight and released him. *Id*. The entire stop lasted 20 minutes.

Morante's questioning of Miller that early morning was limited to Miller's prolonged parking outside closed businesses, the ownership of the truck he was driving, and confirming that Miller was not using or possessing controlled substances. Morante accomplished all of that in 20 minutes.

Based on all the circumstances known to Morante following his initial stop of Miller, and considering his knowledge and experience as a law enforcement officer, the undersigned finds it implausible that Morante lacked sufficient reasonable suspicion to warrant detaining Miller further while he confirmed the ownership of the truck being driven my Miller, his permissive use of the truck, and that the operator of that truck at 2:00 a.m. was neither under the influence or in possession of any contraband.[4] *See, e.g., Morris v. Dean*, 223 F. Appx. 937, 939 (11th Cir. 2007) (per curiam).

---

[4] While Miller claims Morante kept him detained for 20 minutes because Morante did not like that he was recording the SAPD activity, this this may be a possible explanation for Morante's actions, but it is not a

14

### B. Miller cannot plausibly allege all essential elements of a First Amendment retaliation claim.

"The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). A First Amendment retaliation claim requires a plaintiff to plausibly show that: (1) he was engaged in constitutionally protected activity, (2) the defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendant's adverse actions were substantially motivated against the plaintiff's constitutionally protected conduct. *Villarreal v. City of Laredo, Texas*, 2024 WL 244359, at *14 (5th Cir. Jan. 23, 2024) (en banc).

Miller's retaliation claims fails for the same reason that his Fourth Amendment claim fails—Morante had sufficient reasonable suspicions to justify his actions. The Fifth Circuit has steadfastly adhered to the principle that a retaliation claim only lies when "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences." *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal quotation marks omitted)); *accord Keenan*, 290 F.3d at 260; *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019).

The undersigned has already concluded that Morante's stop of Miller was supported by reasonable suspicion. Moreover, as explained above, there are no facts from which the

---

plausible one. It is important to note here that after Miller told Morante at the beginning of the stop that he had been recording the SAPD activity, Morante never mentioned that topic again. Indeed, it is Miller who repeatedly returns to the topic of his recording activity and his ongoing distrust of and anger toward the SAPD.

Court can reasonably infer that Morante's actions were substantially motivated against Miller's constitutionally protected conduct of recording the police. Even by Miller's allegations, and certainly by the bodycam recording, Morante was both unaware of Miller's recording activity when he stopped him and, once Miller told him of it, Morante appeared completely disinterested in it.

Nonetheless, there is an avenue—albeit an exceedingly narrow one—still available for Miller to make out a retaliation claim. In *Nieves*, the Supreme Court left open the possibility that a plaintiff could make out a retaliatory arrest claim even where law enforcement had probable cause for their actions. 139 S. Ct. at 1727. The Court held that the presence of probable cause could not defeat a retaliation claim in those instances where a plaintiff has put forward "objective evidence that he was arrested when otherwise similarly situated individuals" were not. *Id.*

But Miller admits that he does not have such evidence. Dkt. No. 13 at 1. Therefore, the undersigned finds that Miller has not pled a viable First Amendment retaliation claim and the Court should dismiss his claim for failure to state a claim upon which relief may be granted.

## VI. CONCLUSION

For the reasons above, the undersigned RECOMMENDS that the Court DISMISS Miller's claims for failure to state a claim upon which relief may be granted.

## VII. RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Find-

ings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

ORDERED this 4th day of March 2024.

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE